RANDY S. GROSSMAN
United States Attorney
OLEKSANDRA Y. JOHNSON
Assistant U.S. Attorney
California Bar No. 265442
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
Tel: (619) 546-9769
Email: Oleksandra.Johnson@usdoj.gov

GUSTAV W. EYLER
Director
LAUREN M. ELFNER
Trial Attorney
Maryland Attorney No. 1212110253
WEI XIANG
Trial Attorney
Florida State Bar No. 85604
U.S. Department of Justice
Consumer Protection Branch
450 Fifth Street, NW, Suite 6400
Washington, DC 20001
Telephones: (202) 305-7171/532-4140
Emails: Lauren.Elfner@usdoj.gov
Wei.Xiang@usdoj.gov

Attorneys for the Plaintiff
UNITED STATES OF AMERICA

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>TIMOTHY INGRAM,<br><br>Defendant. | Case No.: 21CR2216-CAB<br><br>**UNITED STATES' SENTENCING MEMORANDUM**<br><br>Date: August 31, 2022<br>Time: 10:00 A.M.<br>Courtroom 15A<br><br>Hon. Cathy Ann Bencivengo |

For almost a year, Defendant Timothy Ingram engaged in a nationwide "grandparent scam" conspiracy that targeted elderly Americans and resulted in losses of over $2 million.

The Defendant's criminal enterprise extorted more than 70 victims nationwide, most of whom were in their seventies or eighties. Ingram's participation in the conspiracy was lengthy and substantial: for nearly a year, he ran a network of money mules who conducted cash pick-ups and received wire transfers from victims who believed they were sending money to help a grandchild or other close relative or friend. Ingram provided the mules with details about the victims, including addresses and names. He coordinated cash pick-ups by his mule network through encrypted messages, instructing the mules on when to approach the victims' doors, what fake name and occupation to tell the victims, and where to deliver the cash proceeds. Although most of Ingram's activity occurred in California, at times, he directed mules to travel out of the state to execute the same scheme elsewhere. He also recruited mules to receive wire transfers of victim funds into their bank accounts, and provided extensive instruction and supervision over how to withdraw the funds to avoid getting caught. And on at least one occasion, Ingram conducted a cash pick-up himself, collecting $42,000 in person from a 76-year-old victim in Burbank, California.

Defendant pleaded guilty to one count of racketeering conspiracy admitting to his participation and leadership in an organized scheme to defraud, extort, and launder money from elderly victims in San Diego County and across the United States. Based on actual and intended loss totaling approximately $2 million, the number of vulnerable victims, and other factors, the defendant's adjusted offense level is 30. He is in Criminal History Category II, and his guidelines range is 108 to 135 months. For Defendant's crimes, the United States recommends that the Court sentence Ingram to 108 months in custody, followed by three years of supervised release.

## I.

## FACTUAL BACKGROUND

Ingram was indicted for racketeering conspiracy in July 2021, along with seven co-defendants, for his participation in a scheme commonly known as a "grandparent scam." Members of the criminal organization contacted elderly victims, generally by phone, and falsely convinced the victims that a younger relative or friend was in legal trouble and

needed money to pay for bail, pay medical expenses for car accident victims, or prevent additional charges from being filed. Preying on the victims' fear for the wellbeing of their younger loved ones, the conspirators, among other things, impersonated attorneys, employees of security and courier services, and, at times, the victims' grandchildren themselves, often in distress and crying. To isolate the victims and maximize the likelihood of successfully obtaining money, the defendant's co-conspirators instructed victims to lie to family, friends, and bank personnel about their financial transactions. Victims sent money to members of the organization in three main ways: (1) in-person cash pick-ups; (2) wire transfers; and (3) mailed cash payments. As a result of such extortion and fraud, Defendant and his co-conspirators induced victims to provide the criminal organization thousands to tens of thousands of dollars each to purportedly help their grandchild, close relative, or friend.

Defendant, a 30-year-old resident of North Hollywood, California, was responsible for organizing and managing a network of mules that conducted cash pick-ups and received wire transfers from elderly victims. From November 2019 until October of 2020 (during which he was also serving a 24-month term of court-ordered supervision following guilty pleas in a North Carolina felony drug case), Defendant Ingram directed others, including co-defendants Anajah Gifford and Jack Owuor, to conduct in-person cash pick-ups and obtain bank accounts that could receive and transfer funds from elderly victims. For cash pick-ups, Ingram typically received information identifying victims, including their addresses, from co-defendants Tracy Knowles and/or Adonis Alexis Butler Wong. Defendant then coordinated and dispatched mules from his network to the victims' homes to collect the money. Ingram gave the mules information about the victims, including their names, addresses, and sometimes their grandchild's name, and provided detailed instructions for the pick-up, such as when to arrive at the door and what to tell the victims. Although most of the mules under Ingram's supervision worked in southern and central California, Defendant also directed mules to travel outside of the state to conduct pick-ups. *See* PSR ¶ 30.

For example, on March 25, 2020, Ingram exchanged messages with co-defendants Knowles and Butler about picking up money from several victims in California. After getting the victims' information from Knowles, Ingram subsequently directed co-defendant Owuor to collect money from three victims in one day:

    9:50 a.m.: Knowles to Butler and Ingram: "I have a solid gathering cash @ … This … Addy … [victim street address] … Downey cali 90241 … 8k …. Let me know eta on that."

    10:01 a.m.: Knowles to Butler and Ingram: "How far guys?"

    10:04 a.m.: Butler to Ingram by text: "Bro reply to the group"

    Ingram to Butler and Knowles: "45"

    10:39 a.m.: Ingram to Owuor: "[victim street address] … Downey, CA 90241 … United States"

When Owuor advised he didn't have a working Uber account to arrange a ride for the pick-up, Ingram arranged an Uber for Owuor. Ingram then provided additional instruction to Owuor before he retrieved the cash:

    11:25 a.m.: Owuor to Ingram: "What's the persons name and the name ima use and the reference code they gave em…Like the confirmation number that they be writing on the paper an shit."

    11:27 a.m.: Ingram sends Owuor a screenshot of a text from Butler: "Client…[victim L.L.] (aunt)…Nephew: [name]…Addy…[victim street address]…Downey ca 90241…File # PC7191.

    11:27 a.m.: Ingram to Owuor: "Lmk when u 10 min away."

    11:28 a.m.: Owuor to Ingram: "What's gon be my name"

    Ingram to Owuor: "Nation Wide Bonding courier. U came to collect a package for [name]."

    11:30 a.m.: Owuor to Ingram: "Ight what name am I gon use bro…For me."

    11:31 a.m.: Ingram to Owuor: "Your name is Alex…Tell Uber wait for u too…Alex Wafer."

4

USA Sentencing Memorandum
21CR2216-CAB

> 11:33 a.m.: Owuor to Ingram: "I'm 10 min away."
>
> 11:43 a.m.: Ingram to Owuor: "Don't go to door till I tell u too…When I give u green light go"
>
> Owuor to Ingram: "I thought it was ready …. I'm here."
>
> 11:45 a.m.: Ingram to Owuor: "It is they jus preepin it … 2 mins."

At approximately 11:50 a.m., Owuor picked up $8,000 in cash from L.L., an 89-year old victim. The victim reported to police that the courier used the name "Alex Waffle." *See* Exhibit 1 at 93, Victim Impact Statement of L.L. (filed under seal). That same day, Ingram directed Owuor to two other homes in California – the home of 77-year-old victim K.B. in Long Beach, California, where Owuor retrieved $8,000 in cash, and the home of 76-year-old victim J.H. in Arcadia, California, where Owuor collected $17,500 in cash. *See id.* at 74, Victim Impact Statement of J.H. Each of these victims believed, falsely, that their loved one was in jail and needed money for bail. In total, Ingram directed the pick-up of $33,000 in cash by one mule from three victims in a single day. *See* PSR ¶ 12.

Similarly, on May 19, 2020, Ingram dispatched Jasmin Parore, a mule who later pleaded guilty to charges in San Diego Superior Court,[1] to conduct a cash pick-up from J.A., a 78-year-old victim in El Cajon. That same day, J.A. received a phone call from an unknown male claiming to be her grandson needing money to pay for damages resulting from a DUI collision. PSR ¶¶ 18-19. Ingram exchanged a series of messages with Parore, where he provided her with the victim's name, address, and the name of the grandson. Defendant instructed Parore to play the role of "bailiff" and that the money was to pay for damages to a car. Parore ultimately picked up $7,600 in cash from J.A. *See* Exhibit 1 at 12, Victim Impact Statement of J.A.

While Ingram's role was primarily as a supervisor, he also conducted at least one in-person money pick-up from a victim in January 2020. On January 16, Ingram was captured on 76-year-old victim J.E.'s video doorbell in Burbank, California collecting $42,000 in

---

[1] Parore was sentenced to four years in state prison. PSR ¶ 34.

cash after the victim received several phone calls from unknown individuals who claimed that his daughter-in-law was in jail. *See* PSR ¶ 10. That same day, Ingram posted a photo of himself on his Instagram account holding a large stack of $100 bills.




In addition to cash pick-ups, Ingram also recruited and supervised money mules who received deposits and wire transfers from victims into their bank accounts. Mules were recruited by Ingram and others, provided their bank account information, and, typically several days later, received a large wire transfer from a victim. Ingram then directed and

coordinated the withdrawal of the funds from the mules' bank accounts, generally in increments under $10,000 to evade bank reporting requirements. *See, e.g.*, Indictment ¶¶ 10.1-10.15; 10.22-10.27; 10.71-10.74; 10.84-10.91; PSR ¶¶ 6, 7, 9, 24, 28. Ingram is personally linked to more than 20 victims through the messages on his phones and those of his co-conspirators.

Ingram was aware that the communications on the phone presented a risk if intercepted or seized by law enforcement. He frequently instructed his associates to use encrypted messaging applications, and to destroy evidence of their crimes by deleting message threads from their phones. On one occasion, he called off Parore from approaching a victim's door after the victim figured out that it was a scam, messaging that the house "jus burnt." PSR ¶ 26.

Ingram's coaching of his associates continued even after his arrest. After Ingram and co-defendant Gifford, who was also his girlfriend, were taken into custody, they discussed a concern about what might be discovered on Gifford's phone. Ingram instructed Gifford to not reveal her phone password to the authorities:

> Gifford: Fucking phone [UI]
> Ingram: No, they got your phone? Damn. The telegram and shit? Is yo' shit open?
> Gifford: No, it is locked.
> Ingram: Alright, good. Did you tell them your code?
> Gifford: No. No code.
> Ingram: Don't say nothing bro. We're good.

But Ingram did not always keep his activities secret – he often publicly bragged about the lifestyle that his crimes allowed him and Gifford to maintain. As evidenced by images below, Ingram and Gifford's social media posts boasted about their cash and designer attire, calling themselves "breadwinners."

7

USA Sentencing Memorandum
21CR2216-CAB



Even though Ingram became aware of the federal investigation in October 2020 after the FBI seized his cell phone and searched his residence, he did not heed the warning and continued to engage in criminal activity. For example, on August 7, 2021, mere days before he was taken into custody in this case, Ingram was arrested in North Hollywood after a Wells Fargo Bank employee reported fraud to local law enforcement. According to police reports, a bank customer had been recruited by Ingram and another individual on Snapchat to act as a money mule. Ingram, who was waiting outside the bank as the customer attempted to complete a transaction, was arrested. Law enforcement found almost $5,000 in cash and three debit cards issued in different names on Ingram at the time of arrest. Ingram denied his involvement and the charges were eventually dropped.

But by then, Ingram's luck had run out. Three days later, on August 10, 2021, the FBI arrested Ingram on the charge in this case. At the time, he had $1,000 in cash on his

person. PSR ¶ 33. A subsequent search of the residence where Ingram and Gifford resided prior to their arrests confirmed that they continued to engage in criminal activity: law enforcement found eight debit cards, each issued in a different name, including one in the name of C.W., an elderly man from Oklahoma. C.W. was interviewed, and reported a recent attempt to impersonate him by an unknown perpetrator who walked into a bank branch in Chicago, presented what appeared to be C.W.'s ID, and attempted to cash out C.W.'s account. The bank employee became suspicious when the perpetrator was unable to sign the victim's name correctly. The FBI found an envelope addressed to C.W. with a Visa debit card issued to C.W. at Ingram's residence.

On March 2, 2022, the defendant pleaded guilty to racketeering conspiracy as charged in the Indictment.

## II
## SENTENCING GUIDELINES

Ingram pleaded guilty to one count of racketeering conspiracy. In his plea agreement, Ingram admitted to a lengthy factual basis, and agreed that his U.S. Sentencing Guidelines produce an adjusted offense level of 30. *See* Plea Agreement, ECF No. 152. The parties agreed to the following Guidelines:

| | |
|---|---:|
| Base Offense Level [§ 2B1.1(a)] | 7 |
| Loss Greater than $1,500,000 [§ 2B1.1(b)(1)(I)] | +16 |
| Ten or More Victims and Mass-Marketing [§ 2B1.1(b)(2)(A)(i), (ii)] | +2 |
| Vulnerable Victim [§ 3A1.1(b)(1)] | +2 |
| Large Number of Vulnerable Victims [§ 3A1.1(b)(2)] | +2 |
| Organizer [§ 3B1.1(a)] | +4 |
| RICO Base Offense Level [§ 2E1.1(a)(2)] | 33 |
| Acceptance of Responsibility | -3 |
| **Adjusted Offense Level:** | **30** |

The Probation Office prepared a Presentence Investigation Report in this case. PSR, ECF No. 210. A Second Addendum to the PSR filed on July 21, 2022, indicates that Ingram is in Criminal History Category II. ECF No. 224. The advisory sentencing Guideline range, based on an offense level of 30 (with credit for acceptance of responsibility) and a Criminal History Category of II, is 108 to 135 months. The United States joins Probation in recommending that the Court impose a sentence at the low end of that range, 108 months in custody, followed by three years of supervised release.

### III
### ANALYSIS OF § 3553(a) FACTORS

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49, (2007) (citing *Rita v. United States*, 551 U.S. 338, 347-48 (2007)). The sentencing court must then consider all seven factors listed in 18 U.S.C. § 3553(a) to "determine whether they support the sentence . . . ." *Id.* & n.6. The factors include: the nature and circumstances of the offense and the history and characteristics of the defendant; the purposes of sentencing; the kinds of sentences available; the sentences and ranges established by the Sentencing Guidelines; relevant policy statements issued by the Sentencing Commission; the need to avoid unwarranted sentencing disparities among similarly situated defendants; and the need to provide restitution to victims. 18 U.S.C. § 3553(a).

The statute instructs that the sentencing court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing described in the second factor. 18 U.S.C. § 3553(a). "The fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall v. United States*, 552 U.S. at 50 n.6. In this case, a 108-month sentence—at the low end of the applicable guidelines range—is appropriate.

As detailed above and in the PSR, over the course of nearly a year, Ingram knowingly and willfully participated in a nationwide racketeering scheme targeting the

elderly. The nature and circumstances make this an unquestionably serious offense. PSR ¶ 103. Aggravating factors include Ingram's role as an organizer, the large number of vulnerable victims, the actual and intended loss of approximately $2 million, and the emotional, psychological, and financial impact of Ingram's conduct. As noted by Probation, Ingram "was an organizer, manager, and manipulator of not only victims, but also those he hoped to bring into the scam." *Id.*

The impact of Ingram's conduct on his victims is difficult to overstate. Ingram and his co-conspirators purposely targeted elderly individuals, preying on their love and concern for their grandchildren or other relative. To date, the United States has received 36 victim impact statements from victims who lost money to the Defendant's criminal organization. *See* Exhibit 1, Victim Impact Statements (filed under seal). These statements indicate that victims lost substantial portions of their savings. *See, e.g.*, Exhibit 1 at 33, Victim Impact Statement of J.C. (86-year-old victim from Fergus Falls, Minnesota, $10,000 loss) ("I have been widowed for over 40 years and have worked very hard to save for my family . . . I have no means of helping anyone now, only hope I can continue to pay my own way."); *id.* at 119, Victim Impact Statement of Widow of D.P. (79-year-old victim from Carlsbad, CA, $64,000 loss) ("Not sure what this loss will have on my future. This money was a large portion of our retirement savings."); *id.* at 12, Victim Impact Statement of J.A. (78-year-old victim from El Cajon, CA, $7,600 loss) ("Lost our retirement money.").

Perhaps more significant than the financial loss, however, is the emotional toll the conduct has taken on the victims. Many victims suffered from deep and long-lasting psychological damage, and in some cases physical harm, because of Ingram's crimes. Some victims have needed to see psychiatrists as a result of the crimes; others feel deeply humiliated and ashamed, or have lost their sense of selves and independence:

<u>L.L., 88-year-old victim from Downey, CA ($18,000 loss), Exhibit 1 at 93-94:</u>

*"It's changed my view of people, made me more suspicious and less trusting. Also, given my age (90) I'm concerned my family might believe I'm not to be trusted with my own welfare."*

*"It was a significant amount of money that could have helped someone in my family."*

S.D., 79-year-old victim from San Diego, CA ($9,000 loss), Exhibit 1 at 49-50:

*"My extra money I had saved is gone. I can't trust my grandchildren."*

*"I was humiliated in front of family and friends who thought I should have known better. This money was saved over years of working hard to retire and be able to have a little cushion to spend or take care of medical bills."*

J.H., 76-year-old victim from Arcadia, California ($17,500 loss), Exhibit 1 at 75:

*"Our situation as a result of the crime has caused financial hardship as well as stress. My husband passed away in April of 2022. I feel the ongoing incident impaired our health, high blood pressure, anxiety, stress. My husband died of cardiopulmonary arrest."*

Widow of D.P., 79-year-old victim from Carslbad, CA ($64,000 loss), Exhibit 1 at 120:

*"I still can't think about this crime without crying."*

*"My husband, [D.P.], was sad and upset about this until he passed away."*

J.S., 84-year-old victim from San Diego, CA ($21,500 loss), Exhibit 1 at 134-35:

*"Our family's sense of security is shattered. We became afraid and our children no longer looked up to us."*

*"I am a big loser – I no longer have confidence in myself in all situations."*

T.C., 60-year-old victim from Anaheim, CA ($18,000 loss), Exhibit 1 at 42-43:

*"Still have an overwhelming sense of guilt and shame."*

*"I felt devastated and very disappointed in myself. Felt physically ill with heart palpitations and overwhelming dread."*

E.L., 89-year-old victim from Gansevoort, NY ($12,000 loss) (deceased, submitted by her children), Exhibit 1 at 91-92:

*"The impact of the crime committed on May 20, 2020, was devastating to my mother, E.L., then 89 years old, as well as our entire family. It was the downfall of both her mental and physical health. For us children, it was painful to watch my mother go from a gregarious, outgoing person to a frightened victim of this crime. She would often say she felt as if she had been raped by the criminals who did this to her. She never recovered from the shock of having $12,000 extorted from her."*

*"This crime changed how my mother felt about herself and others. She blamed herself for what happened and felt really stupid and demoralized for falling for this scam."* The trauma experienced by the victims, as well as the effect of Defendant's actions on the lives of victims and their family members, are properly considered when analyzing the need for just punishment under the § 3553 factors, as well as to reflect the seriousness of the offense.

The need for specific deterrence also merits a within-Guidelines sentence. Ingram engaged in this criminal activity while on probation for a prior drug case from North Carolina. He was arrested in December 2015, and his supervision was transferred to Los Angeles County in May 2019 and terminated in November 2020. *See* Second Addendum to PSR, ECF No. 224. According to the factual basis in the plea agreement, the defendant admitted that he was a knowing and willful participant in a wide-ranging "grandparent scam" between approximately November 2019 and October 2020. Thus, the defendant's time on supervision overlapped by nearly a year with the racketeering conspiracy to which he has pleaded guilty. Moreover, as described further above, despite Ingram's knowledge that he was being investigated for his conduct after the FBI searched his residence in October 2020, he continued to engage in criminal activity right up until his arrest in August 2021.

A 108-month sentence is also needed "to afford adequate deterrence to criminal conduct" by others who might engage in such a crime. 18 U.S.C. § 3553(a)(2)(B). Grandparent scams are not unique to the Defendant's conspiracy. Although high in emotional trauma to victims, they are often challenging, if not impossible, for most

resource-stretched law enforcement authorities to combat due to the compartmented individual losses and national (or transnational) nature of the organized crime. Exploiting emotionally vulnerable victims in this manner must therefore be met with stern sentences to deter other would-be perpetrators.

Additionally, imposition of a sentence of 108 months best serves "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Congress sought uniformity in sentencing by narrowing the wide disparity in sentences imposed by different federal courts for similar criminal conduct prior to the Guidelines. Since uniformity remains an important goal of sentencing, § 3553(a)(6) directs district courts to consider the need to avoid unwarranted disparities. In this case, one of the money mules Ingram supervised during the conspiracy, Jasmin Parore, received a stipulated sentence of four years in custody. Ingram's involvement and conduct in the scheme was unquestionably more extensive, lengthy, and serious, which his sentence must reflect and punish accordingly.

To ensure just punishment and deter other would-be fraudsters, a custodial sentence at the low end of the guidelines is appropriate. The United States has considered all the factors set forth under 18 U.S.C. § 3553(a), and recommends that Timothy Ingram receive a sentence of 108 months in custody. The sentence at the low end of the guidelines fulfills the aims of 18 U.S.C. § 3553(a) and marks a sufficient, but not greater than necessary, sanction to account for Defendant's conduct.

## IV

## RESTITUTION[2]

"Federal courts have no inherent power to award restitution, but may do so only pursuant to statutory authority." *United States v. Follet*, 269 F.3d 996, 998 (9th Cir. 2001).

---

[2] Defendant may be liable for a fine based on his conviction. However, under the circumstances, the United States does not recommend a fine. Instead, the money should be used to pay restitution to the victims.

Statutory authority commonly derives from the Victim and Witness Protection Act (18 U.S.C. § 3663) and the Mandatory Victims Restitution Act ("MVRA"), which provides for mandatory restitution for crimes of violence and property offenses (18 U.S.C. § 3663A).

The MVRA requires courts to impose restitution for property offenses committed by fraud or deceit, in which an identifiable victim has suffered a pecuniary loss. *See* 18 U.S.C. §3663A(c)(1)(A), (B). A defendant must be ordered to pay restitution to any victim "directly and proximately harmed" as a result of his offense of conviction, "including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person harmed by the defendant's criminal conduct in the course of the scheme, conspiracy or pattern." 18 U.S.C. § 3663A(a)(2).

"Restitution seeks to compensate the victim for all the direct and proximate losses resulting from the defendant's conduct . . . ." *United States v. Gossi*, 608 F.3d 574, 581 (9th Cir. 2010) (emphasis omitted). Restitution is limited to those losses directly resulting from the defendant's criminal conduct. *United States v. Gamma Tech Indus.*, 265 F.3d 917, 927 (9th Cir. 2001); *see also United States v. Koenig*, 952 F.2d 267, 275 (9th Cir. 1991) (holding restitution is permitted "only for losses directly resulting from the defendant's offense" (internal quotations and citations omitted)).

Pursuant to 18 U.S.C. § 3663A, restitution shall be ordered in this case. There are multiple victims in this case who have suffered financial loss. In the financial addendum to the plea agreement, the parties had calculated the amount of restitution for which the Defendant is liable as a total of $1,932,507.93.[3]

//
//
//

---

[3] The United States will prepare a draft Restitution Order and submit it to chambers, and will provide contact information for the victim to the Clerk of Court to facilitate disbursement of restitution funds.

# V
# **CONCLUSION**

The Court should sentence Defendant to 108 months imprisonment, and order him to pay restitution in the amount of $1,932,507.93. Once he has completed his custodial sentence, Defendant should be placed on a period of supervised release for three years.

DATED: August 23, 2022                      Respectfully submitted,

| | |
|---|---|
| GUSTAV W. EYLER<br>Director | RANDY S. GROSSMAN<br>United States Attorney |
| */s/ Lauren M. Elfner*<br>LAUREN M. ELFNER<br>WEI XIANG<br>Trial Attorneys | */s/ Oleksandra Y. Johnson*<br>OLEKSANDRA Y. JOHNSON<br>Assistant U.S. Attorney<br><br>Attorneys for Plaintiff<br>UNITED STATES OF AMERICA |