RANDY S. GROSSMAN
United States Attorney
OLEKSANDRA Y. JOHNSON
Assistant U.S. Attorney
California Bar No. 265442
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
Tel: (619) 546-9769
Email: Oleksandra.Johnson@usdoj.gov

GUSTAV W. EYLER
Director
LAUREN M. ELFNER
Trial Attorney
Maryland Attorney No. 1212110253
WEI XIANG
Trial Attorney
Florida State Bar No. 85604
U.S. Department of Justice
Consumer Protection Branch
450 Fifth Street, NW, Suite 6400
Washington, DC 20001
Telephones: (202) 305-7171/532-4140
Emails: Lauren.Elfner@usdoj.gov
Wei.Xiang@usdoj.gov

Attorneys for the Plaintiff
UNITED STATES OF AMERICA

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOAQUIN LOPEZ,<br><br>Defendant. | Case No.: 21CR2216-CAB<br><br>**UNITED STATES' SENTENCING MEMORANDUM AND RESPONSE TO DEFENDANT'S OBJECTIONS TO THE PSR**<br><br>Date: August 31, 2022<br>Time: 10:00 A.M.<br>Courtroom 15A<br><br>Hon. Cathy Ann Bencivengo |

Defendant Joaquin Lopez engaged in a "grandparent scam" conspiracy that targeted elderly Americans in San Diego County and across the United States. The Defendant's criminal enterprise defrauded and extorted more than 70 victims nationwide, most of whom were in their seventies or eighties. Lopez's participation in the conspiracy was crucial: for a substantial fee, he funneled victim proceeds for one of the scheme's organizers. In exchange for a 20 percent cut, Lopez made available, to other scheme participants, bank accounts under his control to receive wire transfers from victims and to disperse those proceeds.

Defendant pleaded guilty to one count of racketeering conspiracy. Based in part on actual and intended loss from the jointly undertaken criminal activity that was known or reasonably foreseeable to Defendant totaling more than $1.3 million, the defendant's adjusted offense level is 23. The United States recommends that the Court sentence Lopez to 46 months in custody, followed by three years of supervised release.

# I.

# FACTUAL BACKGROUND

Lopez was indicted for racketeering conspiracy in July 2021, along with seven co-defendants, for his participation in a scheme commonly known as a "grandparent scam." Members of the criminal organization contacted elderly victims, generally by phone, and falsely convinced the victims that a younger relative or friend was in legal trouble and needed money to pay for bail, pay medical expenses for car accident victims, or prevent additional charges from being filed. Preying on the victims' fear for the wellbeing of their younger loved ones, the conspirators, among other things, impersonated attorneys, employees of security and courier services, and, at times, the victims' grandchildren themselves, often in distress and crying. To isolate the victims and maximize the likelihood of successfully obtaining money, the conspirators instructed victims to lie to family, friends, and bank personnel about their financial transactions. Victims sent money to members of the organization in three main ways: (1) in-person cash pick-ups; (2) wire transfers; and (3) mailed cash payments. As a result of such extortion and fraud, the

conspirators induced victims to provide the criminal organization thousands to tens of thousands of dollars each to purportedly help their grandchild, close relative, or friend.

From at least as early as February 2020 until October of 2020, Defendant Lopez participated in the enterprise's affairs alongside co-defendant Tracy Knowles.[1] Lopez, a 46-year-old resident of Hollywood, Florida, played a high-risk role for which he was handsomely paid. Lopez controlled a Florida corporation named BMP Trading, Inc., that was incorporated in 2014. Lopez opened business checking accounts at numerous banks for BMP Trading. Through Knowles, Lopez made these BMP Trading and other business bank accounts available to the members and associates of the enterprise who would be on the telephone with the elderly victims, to defraud and extort the victims into transferring large sums of money to the Lopez-controlled accounts. Lopez then funneled the proceeds to other scheme participants, including co-defendant Lyda Harris, who helped launder the fiat money into cryptocurrency.

For example, between February 2, 2020, and February 10, 2020, unknown callers contacted P.T., a 73-year-old woman residing in San Francisco, California, and fraudulently induced P.T. to make multiple wire transfers relating to the purported arrest of her "grandson." One of those wire transfers was $40,000 to one of Lopez's BMP Trading bank accounts. After receiving the P.T. wire transfer, Lopez sent $29,000 to Harris and $2,600 to Knowles. On another occasion, Lopez opened a new account specifically for receiving victim proceeds for the organization. On March 20, 2020, Lopez opened an account at BB&T bank under his business name. One month later, on April 30, 2020, the account received a wire transfer of $46,500 from T.B., a 75-year-old victim from Franklin Lakes, New Jersey. T.B. had received a call that her grandson was arrested after causing a car crash, and she believed she was paying for the injured party's surgery. T.B. was provided the name "BMP Trading" and the bank account information. On April 30, 2020,

---

[1] Lopez and Knowles knew each other well and at one point, were neighbors in the same apartment complex in Hollywood, Florida.

T.B. wired $46,500 to the account Lopez controlled. No other transactions were posted on this bank account prior to the T.B. wire transfer. One week later, on May 6, 2020, Lopez took out the funds and closed the account. Bank surveillance video captured the image of Lopez on May 6, 2020:



Lopez was not unique in funneling victim proceeds for the enterprise. As identified in the Indictment, so did, among others, Mule-5 and Mule-11, as recruited by co-defendants Timothy Ingram and Anajah Gifford, respectively. But unlike most of those mules, who had only personal checking accounts, Lopez leveraged his multiple business checking accounts to launder victim proceeds more effectively. For example, with respect to P.T.'s wire transfer, Lopez didn't simply wire the funds straight of the account to which P.T. had sent it. Instead, as he confirmed to Knowles, he used multiple accounts to complete the transaction (Knowles to Lopez: "Hey just to be clear. U pulling cash and depositing on another account. Or u just wiring it straight out. I think you're doing the first option right?" . . . Lopez to Knowles: "The first one."). Notably, Knowles inquired about the nature of Lopez's business in a message on February 8, 2020, a few days prior to Lopez receiving a wire from victim P.T. (Knowles to Lopez: "Morning Guy. What type of business is your

business." Lopez to Knowles: "A trading company And wholesaler.") Lopez's account received the $40,000 wire transfer from P.T. on approximately February 11, 2020. Lopez knew he had to move the money quickly to meet the volume demands of the organization. For example, on February 14, 2020, Knowles messaged Lopez a screenshot of $150,000 deposit from P.T. into a different account, informing him that they missed out on receiving another wire from the same victim. (Knowles to Lopez: "Fuck we missed this. Same person who sent the 40k. They will be sending another big amount bro let's make sure catch that.") P.T. ultimately lost approximately $217,000 to the criminal organization.

Lopez also had at least one account (under the name of a business other than BMP Trading), which he told Knowles could be used for up to $300,000. *See* Lopez Plea Agreement, ECF No. 193 at 4:25-5:4. Recovered from Knowles's phone was also a purported invoice, from an entity controlled by Knowles, to BMP Trading for 3,350 cases of salmon and other items totaling $32,525. And this wasn't an isolated incident: on other occasions, victims transferring funds to BMP Trading were apparently instructed to provide specific justifications for their transfers. For example, Knowles told an associate to have a "client" sending a $75,000 transfer to BMP Trading to "[p]ut reason in memo as buying a container of avacados [sic] or something close to that as possible." Messages indicate that another victim who sent a $50,000 transfer to BMP Trading was told to state that the reason for the transfer was the "purchase of wholesale goods." These instances further indicate the use of BMP Trading to help conceal and disguise the nature and source of money transfers from Lopez to Knowles, and from victims to Lopez.

Indeed, evidence shows that Lopez did not appear to have a legitimate job outside of his money laundering activities. Surveillance of his purported businesses in Florida did not confirm the presence of Lopez's company or any business activity. For example, the reported address for BMP Trading in Miami Lakes, FL did not list BMP Trading on the building's directory. The location in Medley, FL was observed to be a rental warehouse with no indication of BMP presence. Finally, the reported address in Hialeah, FL, turned out to be a private residence occupied by Lopez's uncle.

Both Knowles and Lopez knew what role he served. In September 2020, Knowles messaged Lopez, asking, "U have acct I can send money too [sic] clean? For me." Subsequent messages do not reflect Lopez's substantive response, but do indicate that he and Knowles spoke.[2] Whatever they may have discussed, seven months of work together would have given Knowles better contemporaneous insight into Lopez's business than any alternate spin the defense will now try to conjure, that Lopez used his bank accounts to launder money for others.

Lopez's payout further reflected his enhanced value to the enterprise. Regarding the P.T. wire transfer, Knowles told Lopez to send 70% to his "plug,"[3] Harris, send 10% to Knowles, and keep 20% for himself. This arrangement called for Lopez to receive double the cut of victim proceeds as Knowles, and far more than the crumbs left for the likes of Mule-5 and Mule-11.

Last, Lopez knew that he was part of a bigger enterprise. In addition to telling Lopez to send 70 percent of the P.T. wire transfer to his "plug," Knowles referenced other scheme participants on his end, and the prospect of additional money to launder, in his messages to Lopez. For example, in other messages regarding the P.T. wire transfer, Knowles told Lopez, "I need some type of Confirmation Guy. My people are on my ass about it. . . . Is it by any chance [sic] to send me a visual that it's there. I Don't [sic] need to see you're [sic] account but if you can crop the line that shows it's there. My people are anal sorry. . . . Once I send that then they'll be off my ass and start the process to refill tomorrow right after we clear. . . . They are ready with 50k as soon as you pull let me know." Several weeks later, Knowles messaged Lopez, "7k and 6k bro. Sent to your pacific account. I

---

[2] Messages between Lopez and Knowles suggest that they were communicating through a variety of encrypted messaging applications, including WhatsApp, Telegram, and Wickr. Although not all of the messages were recovered by law enforcement, it appears that Lopez was not working solely with Knowles. For example, on February 24, 2020, Knowles messaged Lopez: "Hey can you have your guy and you download telegram . . . I will create a group with my guys."

[3] "Plug" commonly refers to a source of supply.

need those pulled today. The client is ready to go big with amounts. Also two more. Call me as soon as you can bro. I want to send 187k to your account but I need things to move quicker with ya bro." After sending the victims' information for the two transfers to Lopez, Knowles followed up, "Let me know. The mooch is ready to send again."

On May 25, 2022, the defendant pleaded guilty to racketeering conspiracy as charged in the Indictment. In his plea agreement, Lopez admitted to a sufficient factual basis for the offense of conviction, but the parties agreed to dispute the loss numbers for Lopez's relevant conduct. *See* Plea Agreement, ECF No.193 at pp. 3-5. In this "Scope Dispute," the government asserts that the loss resulting from the jointly undertaken criminal activity that was known or reasonably foreseeable to Lopez was approximately $1,340,820. Lopez does not dispute that victims and losses resulted from acts of participants other than him that were within the scope, and in furtherance, of the jointly undertaken criminal activity. Lopez asserts, however, that only up to $250,000 in loss was reasonably foreseeable to him and that he should be responsible for restitution to three identifiable victims, and only for the amounts that they sent to him.

## II
## SENTENCING GUIDELINES

Lopez pleaded guilty to one count of racketeering conspiracy. The parties' disagreements on applicable Sentencing Guidelines reflect the Scope Dispute. According to the government's calculations, the following Guidelines apply:

| | |
|---|---:|
| Base Offense Level [§ 2S1.1(a)(2)] | 8 |
| Loss Greater than $550,000 [§ 2B1.1(b)(1)(H)] | +14 |
| Business of Laundering Funds [§ 2S1.1(b)(2)(C)] | +4 |
| RICO Base Offense Level [§ 2E1.1(a)(2)] | 26 |
| Acceptance of Responsibility | -3 |
| **Adjusted Offense Level:** | **23** |

Lopez's involvement in the offense warrants the enhancement for business of laundering funds pursuant to U.S.S.G. § 2S1.1(b)(2)(C). Neither § 2S1.1 nor its

application notes comprehensively define the term "business of laundering funds." The application notes simply instruct a court to consider the totality of the circumstances, § 2S1.1, App. Note 4(A), and list six non-exhaustive "factors that may indicate the defendant was in the business of laundering funds": whether (i) the defendant regularly engaged in laundering funds; (ii) the defendant laundered funds for an extended period of time; (iii) the defendant engaged in laundering funds from multiple sources; (iv) the defendant generated a substantial amount of revenue in return for laundering funds; (v) the defendant had a prior conviction for a money laundering related offense; and (vi) the defendant made statements during the course of an undercover government investigation that he had engaged in any of the conduct listed in factors (i) through (iv). *Id.* at App. Note 4(B)(i)-(vi).

Nor, apparently, has the Ninth Circuit comprehensively defined "business of laundering funds." Other courts of appeals have sought insight from the historical purpose for adding the enhancement to the Sentencing Guidelines: "The [Sentencing] Commission determined that, similar to a professional 'fence,' defendants who routinely engage in laundering funds on behalf of others, and who gain financially from engaging in such transactions, warrant substantial additional punishment because they encourage the commission of additional criminal conduct." *United States v. Lucena-Rivera*, 750 F.3d 43, 52 (1st Cir. 2014) (internal citations and quotations omitted); *accord United States v. Mitchell*, 613 F.3d 862, 869 (8th Cir. 2010); *see, e.g.*, *United States v. Lazo*, 491 F. App'x 942, 944-45 (11th Cir. 2012) (affirming enhancement for truck driver who, over a four-month period, visited his bank 64 times to either deposit or withdraw unlawfully obtained funds for approximately ten percent of their value on behalf of a healthcare-fraud scheme).

Here, Lopez served as a professional money launderer who warrants substantial additional punishment. He used his business name to paint a veneer of legitimacy on dirty money. He used multiple accounts to receive victim proceeds from multiple sources. And he was paid even more than co-defendants who were closer to the fraud. Although

relatively few identifiable victims were traced through Lopez's known bank accounts, Lopez's business practice fits squarely within the enhancement's target profile.[4]

Likewise, the Court should resolve the Scope Dispute in favor of the government's position, that fraudulently induced wire transfers from victims to other launderers and mules, concurrent with Lopez's involvement in the enterprise, were reasonably foreseeable to Lopez and should count toward his relevant conduct. Under Guidelines § 1B1.3(a)(1)(B), in the case of jointly undertaken criminal activity, a defendant's offense level shall account for all acts of others that were within the scope of the jointly undertaken criminal activity, in furtherance of that criminal activity, and reasonably foreseeable in connection with that criminal activity that occurred during the commission of the offense of conviction. "Each conspirator is responsible only for the activities that fell within the scope of his particular agreement with the conspirators, and reasonably foreseeable behavior in furtherance of that particular agreement." *United States v. Riley*, 335 F.3d 919, 928 (9th Cir. 2003) (internal citations omitted).

Here, Lopez agreed to launder illicit proceeds for Knowles and other participants in the enterprise through his bank accounts. Lopez knew that the activity involved upwards of over $100,000 per transaction, and Lopez knew that the activity was continuous, not a one-off. Contrary to the defense's assertion that Lopez "did not have reason to think that other individuals were receiving any wire transfers . . . beyond those that he personally received," ECF No. 247, Def Obj. at 3, Lopez knew that the criminal activity was far more extensive than just him and Knowles. As described above, messages between Lopez and Knowles are clear that there were others involved in the criminal activity, and Knowles

---

[4] Defendant has indicated his intent to submit certain purported business records (e.g., invoices and other evidence he was involved with importing goods) to the Court in support of his sentencing arguments. The United States does not yet know how, if at all, these are relevant to sentencing, and whether there is evidence to indicate these records are legitimate and verifiable. After quickly reviewing the records and understanding Defendant's position, the United States may submit a short and concise supplemental sentencing document to address the records.

references hundreds of thousands of dollars of potential transactions he wanted to send to Lopez—far more than the maximum of $250,000 that Lopez claims was foreseeable to him. That victim proceeds would concurrently be laundered through the bank accounts of other members and associates of the enterprise should have been known or was reasonably foreseeable to Lopez.

The Probation Office prepared a Presentence Investigation Report in this case. PSR, ECF No. 223. The PSR agrees with the government on the resolution of the Scope Dispute and the application of the business-of-laundering-funds enhancement. PSR at ¶¶ 44-46. The PSR, however, further applies victim-related adjustments under § 3A1.1(b), increasing Lopez's offense level by 4. PSR at ¶ 47. The government questions the applicability of those adjustments, as they require that the defendant knew or should have known of a victim's unusual vulnerability. § 3A1.1, App. Note 2. The government's investigation has not yielded such evidence for Lopez, in contrast to other co-conspirators. Should the Court agree with the government's Guidelines calculations, the defendant's recommended sentencing range would be a term of imprisonment of 46 to 57 months.

## III
## **ANALYSIS OF § 3553(a) FACTORS**

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49, (2007) (citing *Rita v. United States*, 551 U.S. 338, 347-48 (2007)). The sentencing court must then consider all seven factors listed in 18 U.S.C. § 3553(a) to "determine whether they support the sentence . . . ." *Id.* & n.6. The factors include: the nature and circumstances of the offense and the history and characteristics of the defendant; the purposes of sentencing; the kinds of sentences available; the sentences and ranges established by the Sentencing Guidelines; relevant policy statements issued by the Sentencing Commission; the need to avoid unwarranted sentencing disparities among similarly situated defendants; and the need to provide restitution to victims. 18 U.S.C. § 3553(a).

The statute instructs that the sentencing court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing described in the second factor. 18 U.S.C. § 3553(a). "The fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall v. United States*, 552 U.S. at 50 n.6. In this case, a 46-month sentence—at the low end of the applicable guidelines range—is appropriate.

As detailed above and in the PSR, Lopez knowingly and willfully participated in a nationwide racketeering scheme targeting the elderly. The nature and circumstances make this an unquestionably serious offense. Aggravating factors include Lopez's use of his business accounts to more effectively launder victim proceeds, the scope of the jointly undertaken criminal activity, and the emotional, psychological, and financial impact of Lopez's conduct.

The impact on the victims is difficult to overstate. The enterprise purposely targeted elderly individuals, preying on their love and concern for their grandchildren or other relative. To date, the United States has received 37 victim impact statements from victims who lost money to the Defendant's criminal organization. *See* Exhibit 1, Victim Impact Statements (filed under seal). These statements indicate that victims lost substantial portions of their savings. *See, e.g.*, Exhibit 1 at 33, Victim Impact Statement of J.C. (86-year-old victim from Fergus Falls, Minnesota, $10,000 loss) ("I have been widowed for over 40 years and have worked very hard to save for my family . . . I have no means of helping anyone now, only hope I can continue to pay my own way."); *id.* at 119, Victim Impact Statement of Widow of D.P. (79-year-old victim from Carlsbad, CA, $64,000 loss) ("Not sure what this loss will have on my future. This money was a large portion of our retirement savings."); *id.* at 12, Victim Impact Statement of J.A. (78-year-old victim from El Cajon, CA, $7,600 loss) ("Lost our retirement money.").

Perhaps more significant than the financial loss, however, is the emotional toll the conduct has taken on the victims. Many victims suffered from deep and long-lasting

psychological damage, and in some cases physical harm. Some victims have needed to see psychiatrists as a result of the crimes; others feel deeply humiliated and ashamed, or have lost their sense of selves and independence:

L.L., 88-year-old victim from Downey, CA ($18,000 loss), Exhibit 1 at 93-94:

"It's changed my view of people, made me more suspicious and less trusting. Also, given my age (90) I'm concerned my family might believe I'm not to be trusted with my own welfare."

"It was a significant amount of money that could have helped someone in my family."

S.D., 79-year-old victim from San Diego, CA ($9,000 loss), Exhibit 1 at 49-50:

"My extra money I had saved is gone. I can't trust my grandchildren."

"I was humiliated in front of family and friends who thought I should have known better. This money was saved over years of working hard to retire and be able to have a little cushion to spend or take care of medical bills."

J.H., 76-year-old victim from Arcadia, California ($17,500 loss), Exhibit 1 at 75:

"Our situation as a result of the crime has caused financial hardship as well as stress. My husband passed away in April of 2022. I feel the ongoing incident impaired our health, high blood pressure, anxiety, stress. My husband died of cardiopulmonary arrest."

Widow of D.P., 79-year-old victim from Carlsbad, CA ($64,000 loss), Exhibit 1 at 120:

"I still can't think about this crime without crying."

"My husband, [D.P.], was sad and upset about this until he passed away."

J.S., 84-year-old victim from San Diego, CA ($21,500 loss), Exhibit 1 at 134-35:

"Our family's sense of security is shattered. We became afraid and our children no longer looked up to us."

"I am a big loser – I no longer have confidence in myself in all situations."

T.C., 60-year-old victim from Anaheim, CA ($18,000 loss), Exhibit 1 at 42-43:

"Still have an overwhelming sense of guilt and shame."

*"I felt devastated and very disappointed in myself. Felt physically ill with heart palpitations and overwhelming dread."*

E.L., 89-year-old victim from Gansevoort, NY ($12,000 loss) (deceased, submitted by her children), Exhibit 1 at 91-92:

*"The impact of the crime committed on May 20, 2020, was devastating to my mother, E.L., then 89 years old, as well as our entire family. It was the downfall of both her mental and physical health. For us children, it was painful to watch my mother go from a gregarious, outgoing person to a frightened victim of this crime. She would often say she felt as if she had been raped by the criminals who did this to her. She never recovered from the shock of having $12,000 extorted from her."*

*"This crime changed how my mother felt about herself and others. She blamed herself for what happened and felt really stupid and demoralized for falling for this scam."*

The trauma experienced by the victims, as well as the effect of Defendant's actions on the lives of victims and their family members, are properly considered when analyzing the need for just punishment under the § 3553 factors, as well as to reflect the seriousness of the offense.

A 46-month sentence is also needed "to afford adequate deterrence to criminal conduct" by others who might engage in such a crime. 18 U.S.C. § 3553(a)(2)(B). Grandparent scams are not unique to the Defendant's conspiracy. Although high in emotional trauma to victims, they are often challenging, if not impossible, for most resource-stretched law enforcement authorities to combat due to the compartmented individual losses and national (or transnational) nature of the organized crime. Exploiting emotionally vulnerable victims in this manner must therefore be met with stern sentences to deter other would-be perpetrators. Furthermore, others like Lopez should be dissuaded from laundering crime proceeds and encouraging the commission of new crimes.

To ensure just punishment and deter other would-be money launderers, a custodial sentence at the low end of the guidelines is appropriate. The United States has considered all the factors set forth under 18 U.S.C. § 3553(a), and recommends that Joaquin Lopez

receive a sentence of 46 months in custody. The sentence at the low end of the guidelines fulfills the aims of 18 U.S.C. § 3553(a) and marks a sufficient, but not greater than necessary, sanction to account for Defendant's conduct.

## IV

## RESTITUTION[5]

"Federal courts have no inherent power to award restitution, but may do so only pursuant to statutory authority." *United States v. Follet*, 269 F.3d 996, 998 (9th Cir. 2001). Statutory authority commonly derives from the Victim and Witness Protection Act (18 U.S.C. § 3663) and the Mandatory Victims Restitution Act ("MVRA"), which provides for mandatory restitution for crimes of violence and property offenses (18 U.S.C. § 3663A).

The MVRA requires courts to impose restitution for property offenses committed by fraud or deceit, in which an identifiable victim has suffered a pecuniary loss. *See* 18 U.S.C. §3663A(c)(1)(A), (B). A defendant must be ordered to pay restitution to any victim "directly and proximately harmed" as a result of his offense of conviction, "including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person harmed by the defendant's criminal conduct in the course of the scheme, conspiracy or pattern." 18 U.S.C. § 3663A(a)(2).

"Restitution seeks to compensate the victim for all the direct and proximate losses resulting from the defendant's conduct . . . ." *United States v. Gossi*, 608 F.3d 574, 581 (9th Cir. 2010) (emphasis omitted). Restitution is limited to those losses directly resulting from the defendant's criminal conduct. *United States v. Gamma Tech Indus.*, 265 F.3d 917, 927 (9th Cir. 2001); *see also United States v. Koenig*, 952 F.2d 267, 275 (9th Cir. 1991) (holding restitution is permitted "only for losses directly resulting from the defendant's offense" (internal quotations and citations omitted)).

---

[5] Defendant may be liable for a fine based on his conviction. However, under the circumstances, the United States does not recommend a fine. Instead, the money should be used to pay restitution to the victims.

Pursuant to 18 U.S.C. § 3663A, restitution shall be ordered in this case. There are multiple victims in this case who have suffered financial loss. As set forth in the defendant's plea agreement and the financial addendum, the parties had agreed that the amount of restitution for which the Defendant is liable depends on the Court's resolution of the Scope Dispute. Should the Court find that victims and losses resulting from acts of participants other than Lopez in their jointly undertaken criminal activity were reasonably foreseeable to Lopez, the parties agreed that the amount of restitution for which the Defendant is liable is a total of $1,173,731.93. Should the Court find that victims and losses resulting from acts of participants other than Lopez in their jointly undertaken criminal activity were not reasonably foreseeable to Lopez, the parties agreed that the amount of restitution for which the Defendant is liable is a total of $136,500.[6]

//
//
//
//
//
//
//
//
//
//
//
//
//
//

---

[6] After the Court resolves the Scope Dispute, the United States will prepare a draft Restitution Order and submit it to chambers, and will provide contact information for the victim to the Clerk of Court to facilitate disbursement of restitution funds.

# V
# **CONCLUSION**

The Court should sentence Defendant to 46 months' imprisonment, and order him to pay restitution accordingly. Once he has completed his custodial sentence, Defendant should be placed on a period of supervised release for three years.

DATED: August 24, 2022                                   Respectfully submitted,

GUSTAV W. EYLER                                          RANDY S. GROSSMAN
Director                                                 United States Attorney


*/s/ Lauren M. Elfner*                                   */s/ Oleksandra Y. Johnson*
LAUREN M. ELFNER                                         OLEKSANDRA Y. JOHNSON
WEI XIANG                                                Assistant U.S. Attorney
Trial Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA